Edward Teitsort, Appellant, v. Illinois Central Railroad Company.—15 S. W. (2d) 779.

Division One, March 29, 1929.

*Jesse T. Friday* and *Robert C. Powell* for appellant.

*Watts & Gentry* and *Arnot L. Sheppard* for respondent; *V. W. Foster* of counsel.

642

RAGLAND, J.—This is a suit for personal injuries. The injuries were suffered by plaintiff on the night of August 27, 1921, at a place where a roadway in Haven Hill Cemetery, in or adjacent to the city of Olney, in the State of Illinois, crossed defendant's railroad. Plaintiff fell upon the crossing at the time one of defendant's trains was approaching, and before he could extricate himself both of his feet were cut off by the passing train. As defendant's liability depends largely, if not wholly, on the character of the crossing, the facts with reference to that will be set forth somewhat at length.

Haven Hill Cemetery belonged to and was under the control and supervision of the city of Olney: it lay between Walnut Street, one of the public thoroughfares of the city, on the east, and a public road on the west; there were no roads or streets adjoining its northern and southern boundaries. It was laid off into small lots and blocks; and there were a number of driveways running parallel with each other through it from east to west, as there were from north to south. The central drive from east to west was known as Spring Street: it was designated on the recorded plat of the cemetery as Spring Avenue: it was not an extention of any street of the city of Olney or of any public road: it was laid out merely as a way to be used in connection with the cemetery. It could be entered, however, from Walnut Street; and it afforded an exit from the cemetery to the public road, on the west. But in passing from the cemetery into the road at that point it was necessary to go through a gate which was ordinarily kept locked.

Defendant's railroad ran north and south through the entire length of the west half of the cemetery. Prior to 1916 none of the east-and-west drives of the cemetery on the east side of the railroad was connected with its extension on the west side by a crossing: until that time there had been no burials on the west side. In March of the year just mentioned the Illinois Service Commission, pursuant to an application made by the city of Olney, ordered the construction of a crossing at grade at Spring Avenue. The order, as appears from the record of the commission, was as follows:

"It appearing that the city of Olney has added to its present cemetery grounds, located immediately to the east of the right of way of the Illinois Central Railroad Company and the Cincinnati, Indianapolis and Western Railway Company, a parcel of land lying immediately across the tracks of said respondents;

"And it appearing that it is necessary to connect the two portions of the cemetery by a driveway across the tracks of said respondents at grade;

"And it further appearing that the city of Olney has petitioned for two grade crossings over the right of way of the defendant companies;

"And it further appearing to the commission that the defendant railroad companies are willing to waive all rights with reference to compelling the city of Olney to obtain the right to cross said tracks by condemnation or other legal method for the crossing, which is an extension of the private street known as Spring Street, and are willing to maintain said crossing between the tracks of the Illinois Central Railroad Company, and Cincinnati, Indianapolis and Western Railway Company for a distance of twenty inches on the outside of each of said tracks;

"And it further appearing to the commission that the said city of Olney is willing to construct and maintain the approaches upon said rights of way to the tracks of the Illinois Central Railroad Company and Cincinnati, Indianapolis and Western Railway Company to within a distance of twenty inches of said defendants' tracks, that is, to within twenty inches of the Illinois Central Railroad on the east and to within twenty inches of the Cincinnati, Indianapolis and Western Railway on the west;

"And it further appearing to the commission that it has full and complete jurisdiction of the parties and the subject-matter herein and the commission being of the opinion that two grade crossings are unnecessary, but that a private grade crossing, which would be an extension of the private street known as Spring Street, for the width of said street, to-wit, about thirty feet, across said right of way of said railroad companies, is necessary and reasonable to pro-

vide access to and from the cemetery grounds of said city of Olney, and that said grade crossings will be reasonably safe;

"It Is Therefore Ordered that a crossing which will be the continuance of a private street known as Spring Street, as shown by the plat filed in this case, for the width of said private street, to-wit, thirty feet, may be constructed at grade across the rights of way and tracks of the Illinois Central Railroad Company and the Cincinnati, Indianapolis and Western Railway Company in the said city of Olney, Illinois; that the said crossing shall be fully planked and level between the rails of each track, with two planks on the outside of each rail of a total width of twenty inches, for a distance of not less than twenty feet, by each of said defendants upon its own right of way, and said defendants shall maintain that part of said street lying between their respective lines of tracks. . . .

" . . . It is understood by this commission, the city of Olney and the said defendants that said Spring Street is desired and intended to be a private street for serving said cemeteries only, and the city shall have the right to keep the same closed by gates or otherwise against general public travel.

"This order shall be final and binding upon the parties herein upon the acceptance of the same on or before the 30th day of March A. D. 1916, by the city of Olney and each of said defendants. The acceptance of the city of Olney shall be in the form of a valid and binding ordinance accepting the terms and conditions of this order."

Subsequently the city of Olney by ordinance duly accepted all the provisions and conditions of said order, and thereafter the defendant and the city duly constructed the crossing and approaches in conformity with it.

Plaintiff offered evidence for the purpose of showing use of Spring Street by the general public: the testimony of the witnesses may be summarized as follows:

Plaintiff testifying in his own behalf:

"Several years ago I lived in the neighborhood, on the west side of the cemetery on a farm, and I had driven backwards and forwards through there quite often to my farm, and there was one time I started through there and there was a gate up on the west side of the cemetery, or at the west end of this street known as Spring Street, and it was locked. . . . Previous to the 27th of August, 1921, I traveled along Spring Street, either to or from Walnut Street and this roadway through the cemetery. On those occasions, with the exception of one time, I never did find the gate locked. . . . Whenever anybody wanted to go through there they always would. I have visited the cemetery there and saw other persons using Spring Street in going to and from Walnut Street and from this street west of the cemetery. I have seen quite a number of people go through

there. . . . Before August, 1921, for four or five or six years when 1 passed through there, I saw others go through there. When I passed through there I was never interrupted or told by anyone that I had no right to go through there.''

Alvin Jacobs: ''I have lived in Olney for nine years and three months, and I am a minister of the gospel. . . . In 1918, I believe it was, or close to that time, I lived on the north side of the cemetery. I roomed on the east side of the road there for three years and had several parishioners on the west side, and that saved me a quarter of a mile to go through there, so I went through using Spring Street in crossing the railroad track. I would judge I did that for about eighteen months; something like that, over a year, from a year to eighteen months. . . . I led the cow through there. We had a pasture on the other side, and it saved about a quarter of a mile each way, and 1 led the cow across that street. . . . Sometimes, I think 1 have driven over that way, to get to church, at least once a week. It was a smoother road, and I would go back the same way. I would go through on foot, sometimes every day, and sometimes not that frequently. . . . I saw other people traveling along the road from the east to the west side of the railroad tracks beyond the gate; I have met them passing through. . . . I saw people who were not attending funerals in there; sometimes it was used by men with coal wagons. You see, there is no street for about a quarter up this way, that is the last one, and it was convenient for people to go through there. I have noticed men with coal wagons go through there often, maybe once or twice. *As a rule I didn't see anyone—* most of the time they had some other business there; they were visiting graves or something like that.''

John Feutz: ''I live on Mr. Brower's place . . . right east of the grave yard, southeast on the hill, on Walnut Street. . . . Prior to August 27, 1921, I was employed by Mr. Brower. . . . Spring Street continues on west of the railroad tracks. It did when they opened it up out there. I used to drive across there quite a good while before Mr. Teitsort got hurt. Prior to August 27, 1921, I saw a gate when it was first put up. I never paid no attention to the gate. Prior to the time Mr. Teitsort was hurt I would go through two or three times a week, sometimes. The gate was open and we drove through; I never paid no attention to it. It was always open. I never paid no attention to the gate; I just drove on through. Sometimes somebody would say something about not going through, but I never paid no attention to it. I am too old a timer for that, I didn't pay any attention at all.''

Frank H. Wagner: ''I drive a team for Mr. Brower. He is in the coal business and is located on Walnut Street. . . . I drove teams through the Haven Hill Cemetery along Spring Street before

August 27, 1921, a time or two. . . . When I drove through the gate was open. . . . On the occasions that I used Spring Street to cross the Illinois Central tracks in the cemetery before Mr. Teitsort was hurt I didn't see any other person going along there, except the men that were working with me, coming along behind, following or on my wagon with me. These wagons were coal wagons."

John Harms: "I am a coal heaver, employed by Mr. Brower . . . I am familiar with the street which runs east and west from Walnut Street through the Haven Hill Cemetery and across the Illinois Central Railroad tracks, but I never knew what the name of the street was. . . . I went through there several times. I went through the cemetery traveling along Spring Street several times before Mr. Teitsort was hurt. Sometime we went through there twice a day, if we were tending crop over there. Some of the crops were for Mr. Moore and some was on the farm of a fellow that owns the old flower house. This farm was north of the cemetery on the west side of the road. In going to and from that farm we went over Walnut Street until we came to the main entrance and then go west through the cemetery and then to the north."

Watson Bellinger: "Prior to the date on which Mr. Teitsort was hurt I saw people using Spring Street to go from one end of Spring Street to the other, across the Illinois Central Railroad tracks. Those people were farming for Mr. Brower. I was acquainted with the men for several years, and I knew some of them before I came. They was hands that Mr. Brower had had for several years, and they went back and forth putting up corn or peas, or something over there, that summer. They were never interrupted, to my knowledge. They hauled watermelons through there. John Boren was sexton of the cemetery at that time. I saw him in the cemetery when people passed through the cemetery using this Spring Street. I never knew of Mr. Boren refusing to allow people to go through the cemetery along Spring Street. He was present when people went through there and he bought watermelons off a wagon. . . . Some days there was a couple of persons went through with teams. It wasn't every day; it might have been every other day for a while when they was putting the crop out, and they put the crop out and got their corn in the fall. I seen them hauling through there in 1921. That was before Mr. Teitsort was hurt."

Kirt Bellinger: "Before Teitsort was hurt I knew of a gate being placed across Spring Street at the west end where it enters a public road that runs north and south. Before August 27, 1921, I drove through the cemetery, especially on Spring Street, to go from the east side of the cemetery to the west side, or from the west side to the east side. I never drove through only just a few times. I would go through as often as once a week or once a month. I was hauling

stuff through. I didn't have any particular business at the cemetery on those occasions. Mr. Boren was sexton of the cemetery. He never objected to my going through the cemetery on those occasions.''

John H. Taylor: ''During the time that I worked in the cemetery from the 2nd day of August, 1921, until the 27th day of August, 1921, I saw some of Mr. Brower's men come through the cemetery along Spring Avenue when they were farming there. Mr. Brower is the coal man down on Walnut Street. His men were farming out west of there. They came though with teams and wagons mostly. I saw other people pass through other than Brower's men. I cannot recall them. On one occasion Mr. Smith, a watermelon man, came through. During that season he came through often. Mr. Boren, the sexton, was present on those occasions. He did not object to them coming through, that I know of.''

Ernest Teitsort, son of plaintiff, testified that he and other children passed over the crossing in going to and from school in the year 1916, and that he saw other people using it; that in 1917 he was working on a farm and made the trip through Spring Street two or three times a week in the evenings; that in 1918 he went through the cemetery to reach a swimming hole; that he passed through there both during the daytime and the nighttime and saw some other people using it; that in 1919 he passed through there both in the daytime and in the nighttime while engaged in courting a young lady in Olney; and that in 1921 he passed through the cemetery practically every night for the purpose of going in swimming and at such times he saw other people passing through.

It seems that immediately after the railroad crossing was constructed a gate was installed at the west end of Spring Street. It was kept locked at first; but before long it was allowed to remain open; and finally it came off its hinges and remained in a state of complete disrepair. Immediately following plaintiff's injury it was repaired and kept locked. The record does not show that any person, either on behalf of himself or the general public, thereafter made any protest on account of the passway through the cemetery having been barred by the locked gate, although the trial of this cause took place nearly four years after that event.

On the evening on which plaintiff received his injury, he entered Spring Street from the east, driving an automobile, intending to go through the cemetery and out into the public road on the west. His objective was to initiate a business transaction with a farmer who lived west of the cemetery. After he had passed over the railroad it occurred to him that the gate at the end of the driveway might be locked: he thereupon turned around and started back. As he drove over the railroad crossing going east, he heard something fall from his car: it sounded to him like a wrench or some other tool. He

turned to one side of the roadway with his car headed slightly northeast and stopped—about twenty feet east of the crossing. It was about eight o'clock, at least it was dark: he endeavored to so adjust the spot light on his car that its rays would fall upon the crossing, and then walked back over it looking for the tool he supposed had fallen. While so engaged his attention was attracted by the ringing of a locomotive bell: it seemed to be coming from where the station was—four or five blocks south and a little east. After continuing his search for a few moments, and hearing the train coming, he concluded to go back over the crossing from the west side where he then was to his car on the east side. As he stepped on to the crossing some protruding object tripped him and he fell sprawling, face forward. The fall "knocked the breath" out of him: he heard the train approaching and endeavored to get up on his hands and knees and crawl off of the track: he found that he could not do that, and then tried to roll off: he succeeded in getting all of his body in the clear except his feet: they were severed.

There was a curve in the track between the station and the crossing: the rays of the headlight of an engine approaching from the south did not fall upon the crossing until the engine had reached a point 269 feet distant from it. The train that inflicted the injury was a light passenger train: it was running at the rate of fifteen miles an hour and could have been stopped within 200 feet. The enginemen did not see plaintiff and knew nothing of the casualty that had befallen him until they stopped at a station further on.

The petition contained five assignments of negligence. It appears from the brief and argument of appellant (plaintiff) in this court that all have been abandoned except the following:

"That the defendant's agents and servants, in charge of and operating said train, saw, or by the exercise of ordinary care upon their part could have seen, plaintiff lying in and upon defendant's said track at a point where said track crosses said Spring Street, and in a position of imminent peril of being struck by defendant's said train, in time thereafter so that the defendant's agents and servants, in charge of and operating said train, by the exercise of ordinary care, with the means at hand and with reasonable safety to themselves and the other persons upon said train, could have stopped said train or slackened the speed thereof so as to have avoided striking and injuring plaintiff, but that defendant's said agents and servants failed to do so."

There was a preceding allegation as follows: "that defendant' said track, in passing through said cemetery, crosses a traveled and open public roadway, street and highway, known as Spring Street."

The answer admitted that plaintiff was injured as alleged in the petition and at the time and place alleged, but denied the remaining allegations. The answer further set forth:

"That no right of action to recover damages for injuries suffered by him on the above-mentioned occasion ever arose in plaintiff's favor, because the place where plaintiff, without invitation from defendant, or right so to do, went upon the defendant's railroad track, was upon the defendant's private right of way and not at any public crossing, nor upon any public street, highway or other place where the public had a right to go, and that under the common law of the State of Illinois, as construed and announced by the Supreme Court of the State of Illinois in the following cases, to-wit: (naming them), and by the Appellate Courts of the State of Illinois in the following cases: (naming them) the defendant owed no duty to look for the plaintiff upon its private right of way; . . . but the sole duty, under said law of the State of Illinois, as announced in the foregoing decisions, owing from the defendant to the plaintiff on, said occasion, was not to wilfully or wantonly injure him, and' defendant did not wantonly or wilfully injure plaintiff; and defendant, under said decisions, did not owe any duty to stop or slow down its train, or make any other effort to avoid injuring the plaintiff unless and until his presence and position of peril actually became known to one or more of the employees of the defendant engaged in the operation of said train, and this defendant says that the presence of the plaintiff and his position of peril never became known to the defendant, or any of its employees, until after plaintiff had actually been run over and injured by said train."

The reply was a general denial. The opinions in the cases referred to in the answer were read in evidence: plaintiff offered no counter-vailing evidence as to the law of the State of Illinois.

At the close of all the evidence the court gave an instruction in the nature of a demurrer to the evidence. Thereupon plaintiff took an involuntary nonsuit with leave. The court subsequently overruled plaintiff's motion to set aside the nonsuit: this appeal followed.

I. The ruling of the trial court that plaintiff had failed to make a case for the jury is the sole ground of challenge on this appeal. Plaintiff's cause of action, if any, arose under the laws of the State of Illinois: the questions presented for consideration must therefore be determined according to those laws, as disclosed by the decisions of the Illinois courts which were read in evidence. [Gersman v. Railroad Co., 229 S. W. 167.]

According to the decisions to which reference will be presently made, the duty owing by respondent to appellant at the time of and immediately preceding the latter's injury depends to a very considerable extent on the character of the railroad crossing over Spring Street. It was alleged in the petition that respondent's track crossed "a traveled and open public roadway, street and highway, known as

Spring Street;'' but there was no proof whatever tending to show the establishment of Spring Street as a public road, street or highway, unless it was that relating to user, and that was wholly insufficient to either raise a presumption of dedication or show the existence of a highway by prescription. [13 R. C. L. 29.] The evidence on the contrary tended to show that Spring Street was laid out as and for a private way: private in the sense that it was not intended for the use of the public at large, but was designed solely for the use of those who had business in the cemetery or were impliedly invited there for some purpose having relation to the cemetery as such. It is clear in any event that the use of the way across defendant's right of way was so limited: the acceptance of the order of the Illinois Service Commission by the defendant and the city of Olney was tantamount to a stipulation by them that Spring Street was ''in tended to be a private street for serving said cemeteries only:'' the crossing at grade over the street was established, constructed and permitted by the order solely on the basis of that understanding. Appellant, therefore, in passing over and being on the crossing, for no purpose having relation to the cemetery or its uses, was where he had no legal right to be.

II. Under the laws of Illinois, as appears from the decisions of the courts of that State which were read in evidence on the trial, the only duty which the respondent owed the appellant was not to wantonly or wilfully injure him. In I. C. Railroad Co. v. Godfrey, 71 Ill. 500, 506, et seq., it was said:

''This cause was tried in the court below, and submitted to the jury, as manifested by the instructions given and refused, upon an erroneous theory, which was, that, from the fact of the citizens of Decatur having been in the habit of passing and re-passing over the portion of defendant's right of way, where the injury in question occurred, the plaintiff had acquired some right which affected the defendant's relation toward him, and that, at the time of the accident, he was in the exercise of a legal right. It very materially affects the question of the respective duties and liabilities of the parties, whether at such time, the plaintiff was in the exercise of a legal right or not.

''The right of way was the exclusive property of the company, upon which no unauthorized person had a right to be, for any purpose. The plaintiff was traveling upon defendant's right of way, not for any purpose of business connected with the railroad, but for his own mere convenience, as a footway, in reaching his home, on return for a search after his cow. There was nothing to exempt him from the character of a wrongdoer and trespasser in so doing, further than the supposed implied assent of the company, arising

from their non-interference with a previous like practice by individuals. But, because the company did not see fit to enforce its rights, and keep people off its premises, no right of way over its ground was thereby acquired. It was not bound to protect or provide safeguards for persons so using its grounds for their own convenience. The place was one of danger, and such persons went there at their own risk, and enjoyed the supposed implied license subject to its attendant perils. At the most, there was here no more than a mere passive acquiescence in this use. A mere naked license or permission to enter or pass over an estate, will not create a duty or impose an obligation on the part of the owner to provide against the danger of accident. . . .

"The negligence of defendant alleged in the declaration is, in not ringing a bell or blowing a whistle before the engine crossed the railroad crossing, and in not slackening speed as it approached and passed over the crossing, and in running at a great rate of speed; and it is further insisted on in argument, as negligence, that there was no fireman employed on the engine, and that those in charge of the engine had their attention directed to the train on the other road, near the crossing, instead of forward, along the track. But the defendant, under the circumstances of this case, is clearly chargeable with no such negligence as this. It is only for wanton or wilful injury that the defendant is here chargeable, or such gross negligence as evidences wilfulness. Notwithstanding the plaintiff was unlawfully upon defendant's right of way, or not in the exercise of a legal right, and that his own lack of ordinary care exposed him to the risk of injury, yet the defendant might not, with impunity, wantonly or wilfully injure him. And if defendant's servants, who were in the management of the engine, after becoming aware of plaintiff's danger, failed to use ordinary care to avoid injuring him defendant might be liable."

The same rule was applied in a farm crossing case, where one who had no legal right to pass over the crossing suffered damage. It was said in that case:

"William Gillespie was driving a team of which appellee owned one horse and the wagon and harness, and was attempting to cross the track of appellant when the team was struck by an engine of appellant. There were no written pleadings, but the only negligence charged against appellant upon the trial or in this court consists in having allowed a bank of dirt, with weeds growing thereon, on its right of way, to remain along a cut near the crossing of the track where the accident occurred, so as to obstruct the view of trains by one approaching the crossing. The crossing in question was located half a mile west of Stronghurst station. Appellant began to run trains there April 29, 1888, and the accident occurred August 24th of the same year. The crossing was put in by appellant in the construction

of its road as a farm crossing. There were gates on both sides of the track; the planks were put in as is usual in farm crossings, and there can be no doubt that it was so intended. Appellee claimed that the character of the crossing had been changed by public use with appellant's consent so that it had become at the time of the accident a public highway crossing, and that, in consequence of such changed character, appellant owed a duty to all persons to keep the view unobstructed so that they might cross with safety. For the purpose of showing that the crossing had become public, appellee introduced evidence that, during the summer of 1888, the route from the west by way of this crossing to the town was shorter than others, as streets of the town in respect to unopened streets was evidently a temporary that was there at that time; that the gate on the north of the track was left open, and that various persons coming from the west passed through the open gate over this crossing and went to Strong-hurst between the track and the south fence. To such use of the crossing it does not appear that appellant objected. This evidence was not sufficient to establish a change in the nature of the crossing. Trains had only been running about four months, and the condition of the town had not been opened from the north through a hedge one, and the fact that persons for their own convenience used this route in going to or returning from the town, with the passive acquiescence of appellant, did not make the crossing a public one, or create any new duty on the part of appellant. A mere naked license or permission to enter or pass over an estate, will not create a duty or impose an obligation on the part of the owner to provide against the danger of accident. [I. C. Railroad Co. v. Godfrey, 71 Ill. 500; I. C. Railroad Co. v. Hetherington, 83 Ill. 510.]

"Gillespie, who was driving the team at the time of the accident, was not using the crossing under any right of an adjoining proprietor of land. He had been to an ice house northwest of the crossing with a butcher wagon, and was returning to town. Appellant owed him no duty to remove the bank of earth east of the crossing, or to cut the weeds so as to afford him a better view of the appellant's premises or trains.

"The only duty of appellant was to observe ordinary care when he was found to be in a place of danger to avoid injuring him, or the property in his charge, and it could only be held liable in case the injury was wilful or wanton. [Blanchard v. L. S. & M. S. Ry. Co., 126 Ill. 416; I. C. Railroad Co. v. Godfrey, supra.]" [A. T. & S. F. Railroad Co. v. Parsons, 42 Ill. App. 93, et seq.]

The doctrine set forth in the two cases quoted from is restated and reaffirmed in the later decisions which were put in evidence, as follows: I. C. Railroad Co. v. Hetherington, 83 Ill. 510; Blanchard v. L. S. & M. S. Ry. Co., 126 Ill. 416; Carroll, Admr., v. C. B. & Q. Ry. Co., 142 Ill. App. Ct. Rep. 195; I. C. Railroad Co. v. O'Connor, 189 Ill.

559; I. C. Railroad Co. v. Eicher, 202 Ill. 556; Ingram v. Jackson, 206 Ill. App. 466; Thompson v. C. C. C. & St. L. Ry. Co., 226 Ill. 542; Cunningham v. T. St. L. & W. Railroad Co., 260 Ill. 589; Joy v. C. B. & Q. Railroad Co., 263 Ill. 465.

There was no evidence tending to show that respondent's enginemen knew or were aware of appellant's presence at the crossing at the time of these conveyances and at the time of the partition suit. fore no proof of wantonness or wilfulness, unless that appears from a phase of the case next to be considered.

III. In Joy v. C. B. & Q. Railroad Co., supra, it was said:

"It has been held by this court, and almost universally, that the law casts no duty upon a railroad company to keep a lookout for trespassers on its track in the open country, remote from public crossings, cities and towns. This is conceded and requires no citation of authority. Exceptions to this general rule are (1) places where the railroad company has permitted the public to travel along or over its track for a considerable period of time and a considerable number of people have availed themselves of such use, and (2) where the railroad runs through populus portions of a city, where people frequently go upon or pass over the track with knowledge of the company or for such a length of time that the company is chargeable with knowledge."

Just how the Illinois courts have applied the first exception is not entirely clear from the record before us. But from a careful consideration of the decisions heretofore referred to, we conclude that a case to fall within the exception must be one where there has been such a continuous and extensive use of a portion of the railroad track by the public, acquiesced in by the company, that the running of a train over it without keeping a lookout or taking other precautions for the safety of persons who might be on it would of itself evidence wilfulness or wantonness. The evidence we think was wholly insufficient to show such a use, especially in the nighttime. A young man passed over the crossing nightly to visit a young woman to whom he was paying court: some young people frequently during the summer evenings passed over it to go swimming. There was no other evidence, except of the vaguest kind, as to the use of the crossing at night by pedestrians or others. And except for the going through of the wagons and teams, during the cropping season, of one Brower who lived on the east side of the cemetery and owned a farm on the west side, the travel over Spring Street and the crossing was merely intermittent and occasional even in the daytime.

Aside from the insufficiency of the evidence, there was no basis in the pleadings for a case within the exception. Nor was the case tried on such theory. It was alleged in the petition that the railroad

crossing was a public crossing, and proof of user was offered presumably to establish that allegation.

On the whole we conclude that the demurrer was well ruled. The judgment of the circuit court is affirmed. All concur.